*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CORA LADANE LYMON also known as COREY LYMON,

Defendant-Appellant.

FOR PUBLICATION
June 16, 2022
9:15 a.m.

No. 327355
Wayne Circuit Court
LC No. 14-010811-01-FC

Before: K. F. KELLY, P.J., and M. J. KELLY and RONAYNE KRAUSE, JJ.

M. J. KELLY, J.

Defendant, Cora Lymon, appeals of right from his jury-trial convictions of three counts of torture, MCL 750.85; three counts of unlawful imprisonment, MCL 750.349b; one count of felonious assault, MCL 750.82; and one count of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to 126 to 240 months' imprisonment for the torture convictions, 84 to 180 months' imprisonment for the unlawful imprisonment convictions, 24 to 48 months' imprisonment for the felonious assault conviction, and two years' imprisonment for the felony-firearm conviction, to be served consecutively to the other sentences. Additionally, because two of his unlawful imprisonment convictions involved minors, he was placed on the sex offender registry as a Tier I offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*[1] On appeal, Lymon argues that there was insufficient evidence to sustain his torture convictions. He also asserts that, because his conviction of unlawful imprisonment of a minor lacked a sexual component, his placement on the sex offender registry violates the Eighth Amendment to the United States Constitution's prohibition against cruel and unusual punishment, and Article I, § 16 of Michigan's 1963 Constitution, which

---

[1] Under SORA, an individual is a Tier I offender if he or she is convicted of a violation of MCL 750.349b and the victim is a minor. See MCL 28.722(q) and (r)(*iii*).

prohibits cruel or unusual punishment.[2]  For the reasons stated in this opinion, we affirm his convictions, but remand for entry of an order removing Lymon from the sex offender registry.[3]

## I.  BASIC FACTS

On September 5, 2014, Lymon confronted his wife, Jacqueline Lymon, with what he believed was proof that she was having extramarital affairs.  His children, both of whom were minors, were present during the confrontation.  When Jacqueline stated that she did not believe him, he said he had text messages to prove it, but, instead of showing her messages, he broke his phone by slamming it onto the table.  He left the house to fix his phone, and when he returned, his argument with Jacqueline continued.  Eventually, she stated that she wanted to end the marriage.  Lymon called her a "cold-hearted bitch" and a "whore."  He then fetched his handgun from the pantry.  One of the children testified that Lymon "cocked" the gun, and the other saw a bullet enter the chamber when Lymon pulled the slide back.

Lymon pointed the gun at Jacqueline and made her sit at the table.  He told her that she was "cold" and "should have left him a long time ago."  Jacqueline stood up with her back to the door.  One of the children moved to stand in front of her, so Lymon pointed the gun at his child. The child pleaded with him to calm down, saying, "dad, that's our mother.  Let's not take it this far."  Lymon sat down, but continued to hold the gun and complain that Jacqueline had "done him wrong for so many years."  He again pointed the gun at his child and told him, "Well, you can get it, too."

Ranting and raving, Lymon forced Jacqueline and the children to move to the sofa in the family room.  While pointing the gun at them, he told his children, "if I kill her, I'm gonna have to kill you guys, too."  They described him as angry, noting that his veins were "popping out." They begged and pleaded for their lives, holding their mother and prayed to God that Lymon would not kill their mother.  Lymon demanded, "What about me?  Don't you love me?"  The children, crying and upset, said that they did but that "right now" he was trying to kill their mother.  Lymon made Jacqueline and the children get off the sofa and kneel in front of the fireplace.  He again

---

[2] Michigan's 1963 Constitution provides broader protection than its federal counterpart.  *People v Bullock*, 440 Mich 15, 30; 485 NW2d 866 (1992).

[3] Lymon sought leave to remand for resentencing based upon his contention that certain offense variables were improperly scored by the trial court.  We denied his motion.  *People v Lymon*, unpublished order of the Court of Appeals, entered March 25, 2022 (Docket No. 327355).  Our denial did not preclude plenary review of this issue.  See *People v Smith*, 336 Mich App 79, 100; 969 NW2d 548 (2021).  However, we decline to consider Lymon's sentencing challenges because they were not raised in his original appeal brief and he failed to comply with MCR 7.212(C)(7) as he did not provide us with a copy of his presentence report.  In any event, although we generally agree with Lymon's argument that a conviction of torture does not per se compel any particular scoring of offense variables 4 or 7, in this case we are not persuaded the trial court erred in its scoring.

stated that he was going to kill them. One of the children testified that they were all screaming at the top of their lung, hoping that the neighbors would hear them.

Jacqueline tried to get Lymon to think about God, but he responded "F God." She told him that she thought "angels are here to protect us." Lymon warned that she was "gonna see angels; you're gonna see a lot of angels in a minute." He then stated, "This is it" and held the gun up. Jacqueline and the children closed their eyes and braced themselves because they feared they were about to die, but Lymon did not shoot them. Instead, he separated Jacqueline from the children. He paced and continued to make comments that if he killed Jacqueline, he had to kill the children because they "wouldn't be able to take it." He also said he was going to do "demonic . . . shit" and was "gonna burn this thing down after I kill you all."

Eventually, he had Jacqueline sit on the sofa next to him. He asked questions and when he did not like the answer, he would hit or slap the back of her head. One of the children told him to stop. Lymon pointed the gun at him and asked what he was going to do about it. He continued to call Jacqueline a bitch and a whore while he had the gun pointed at her side.

At one point, Lymon put the gun in his mouth and told his family to pull the trigger. They did not do so. At another point, Lymon went into the kitchen. One of the children got up from the floor and ran out of the house. He described that he was "freaking out," "scared," and was having trouble breathing. He got to the driveway and stopped because his mother and brother were still inside. Lymon instructed Jacqueline to go and get the child. She went out and convinced him to return to the home because of what might happen to his brother if he did not. She also told him that they could calm Lymon down.

After they returned to the house, Lymon continued to put the gun in his own mouth and point it at his head. They told him not to, that they loved him, and asked him to calm down. He seemed to calm. He allowed everyone to sit on the sofa and placed the gun on a table near to him. He did not permit anyone to leave the room. When the children needed to use the bathroom, he told them that they could urinate against the wall or in a cup because he was "going to burn it down anyway." Around midnight, one of the children was able to retrieve his phone, set an alarm for the morning, and go upstairs. He did not call the police because he was afraid, and after a few minutes, Lymon ordered him to come back downstairs.

Lymon kept Jacqueline and the children in the family room until morning. At some point, someone turned on the television. No one paid attention to it, however, because Lymon still had the gun. The children slept fitfully. One explained that his difficulty sleeping was because he thought he would get killed while he slept. In the morning, Lymon apologized; the children told him that he had just had a bad night and that they would simply forget about it. Lymon drove one child to work and again apologized for his actions. When he returned, he apologized to the other child and agreed that Jacqueline could take that child with her when she went to work. Later in the day, Jacqueline picked up both children and they made a police report.

## II.  SUFFICIENCY OF THE EVIDENCE

### A.  STANDARD OF REVIEW

Lymon first argues that there was insufficient evidence to support his convictions of torture.  This Court reviews de novo challenges to the sufficiency of the evidence.  *People v Miller*, 326 Mich App 719, 735; 929 NW2d 821 (2019).  The evidence presented at the trial is reviewed "in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt."  *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012) (quotation marks and citation omitted).  "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict."  *People v Nowak*, 462 Mich 392, 400; 614 NW2d 78 (2000).  "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime."  *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation marks and citation omitted).  "Minimal circumstantial evidence and reasonable inferences can sufficiently prove the defendant's state of mind, knowledge, or intent."  *Miller*, 326 Mich App at 735.

### B.  ANALYSIS

Torture is defined in MCL 750.85, which states, in relevant part:

(1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.

(2) As used in this section:

(a) "Cruel" means brutal, inhuman, sadistic, or that which torments.

(b) "Custody or physical control" means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.

* * *

(d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:

* * *

(*iii*) The threat of imminent death.

(*iv*) The threat that another person will imminently be subjected to death, great bodily injury, or the administration or application of mind-altering substances or other procedures calculated to disrupt the senses or personality.

Jacqueline and the children did not sustain any physical injuries. Consequently, to establish torture, the prosecution was required to prove beyond a reasonable doubt that (1) Lymon intended to cause cruel or extreme mental pain and suffering, (2) Lymon inflicted severe mental pain or suffering, and (3) Jacqueline and the children were within his custody and control.

Lymon first argues that the evidence was insufficient to show that Jacqueline and the children were within his custody and control because one child ran outside, Jacqueline went after him, and they both returned to the house. However, the child testified that he only went as far as the driveway because his mother and brother were still inside with Lymon. Further, Jacqueline went after the child at Lymon's instruction. She convinced the child to go back into the house because Lymon continued to have one of the children at gunpoint inside and she was afraid of what he would do to that child if they did not return. Therefore, although they went outside, they returned because of their fear of what Lymon would do to the child who was still inside.

Moreover, the record reflects that, throughout the night, Lymon forcibly restricted the movements of Jacqueline and the children. At gunpoint, he ordered them into the family room. He directed them sit on the sofa. He forced them kneel in front of the fireplace. He made Jacqueline sit beside him on the sofa. He prohibited the children from using the bathroom. He briefly allowed one child to go upstairs, but then ordered him to return. When one child left, he made Jacqueline go outside and bring him back. No one was allowed to leave the family room; they had to instead sleep in the room until morning. Viewed in the light most favorable to the jury's verdict, there was sufficient evidence to support a finding that Jacqueline and the children were within Lymon's custody or control.

Next, Lymon argues that there was insufficient evidence to show that he inflicted severe mental pain and suffering on Jacqueline and the children. To establish that Lymon inflicted severe mental pain or suffering, the prosecution had to establish beyond a reasonable doubt that there was "a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner" that is caused by or results from "[t]he threat of imminent death" or "[t]he threat that another person will imminently be subjected to death, great bodily injury . . . ." MCL 750.85(2)(d)(*iii*) and (d)(*iv*). Lymon directs this Court to *People v Schaw*, 288 Mich App 231; 791 NW2d 743 (2010). In that case, this Court found that the defendant inflicted severe mental pain or suffering on the victim based on evidence that she "experienced hallucinations and had to resume her medication after the attack." *Id*. at 235. Lymon argues that, unlike the victim in *Schaw*, Jacqueline and the children did not suffer any substantial alteration of mental functioning. We disagree.

*Schaw* did not hold that the only way to establish a substantial alteration of mental functioning was if the victim suffered hallucinations or had to resume medication after an attack. Here, Jacqueline and the children all believed that they were going to die. They were forced to kneel in front of the fireplace. They pleaded for their lives. They cried. They screamed at the top of their lungs in the hopes that the neighbors would hear them. They prayed and implored Lymon to think of God. When Lymon told them that "this was it" and that he was going to kill them, they

closed their eyes and braced themselves to die. This evidence shows that Jacqueline and both children had a substantial alteration of mental functioning given that they each believed that death was imminent. Moreover, it was manifested in a visibly demonstrable manner given that they were crying, screaming, praying, pleading for their lives, and closing their eyes and bracing themselves to be killed. The child that fled the house also testified that he was "freaking out" and having difficulty breathing. He also described that he had difficulty sleeping because he was afraid that he was going to be shot while he was asleep. On this record, there was sufficient evidence to support the jury's finding that Lymon inflicted severe mental pain or suffering on Jacqueline and the children.

Finally, Lymon argues that there was insufficient evidence to show that he intended to inflict severe mental pain or suffering on Jacqueline and the children. In support, he directs this Court to his testimony that the gun was unloaded and to his own testimony that the only reason he brought the gun out was to show that it was not enough to protect the family against threats made by a woman named "Karen."

Yet, Lymon's testimony that the gun was unloaded was directly contradicted by testimony that one child saw a bullet enter the gun's chamber. Conflicts in the evidence are resolved in favor of the jury's verdict. *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). The jury was not required to credit his testimony. *Id*.

Moreover, despite Lymon's testimony that he was only displaying the gun to show that he could not protect his family from outside threats, the jury could reasonably infer a different intent based on his actions and words. Lymon frequently threatened to shoot Jacqueline and the children. He made that threat while they were sitting on the sofa in the family room after he had forced them to sit there. He repeated it after making them kneel in front of the fireplace. He was ranting and raving and so angry that his veins were visible. Although his family was praying, crying, screaming, and pleading for their lives, he continued to threaten to kill Jacqueline and then the children. He denied them the use of the bathroom and instead instructed them to urinate in a cup or against the wall. He told them that it would not matter because—as he stated more than once— he was going to burn down the house. The jury could reasonably infer that, given the visible mental distress of Jacqueline and the children, and given that he repeatedly told them he was going to kill them, he was aware that he was inflicting severe mental pain or suffering, but rather than stop, he continued to make threats, including when he lined them up in front of the fireplace on their knees. Intent "is a secret of a man's mind" that may be disclosed by declarations or actions. *People v Quigley*, 217 Mich 213, 217-218; 185 NW 787 (1921). Here, viewed in the light most favorable to the jury's verdict, both Lymon's actions and his declarations throughout the incident support an inference that he intended to inflict severe mental pain or suffering on Jacqueline and the children.

### III. CRUEL OR UNUSUAL PUNISHMENT

### A. STANDARD OF REVIEW

Lymon next argues that requiring him to register as a sex offender for his convictions of unlawful imprisonment is cruel or unusual punishment under Michigan's 1963 Constitution or cruel and unusual punishment under the Eighth Amendment of the United States Constitution. In

order to preserve a claim that a defendant's sentence is unconstitutionally cruel or unusual, the defendant must first raise the claim in the trial court. *People v Burkett*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 351882); slip op at 2. As explained in *Burkett*:

> [W]e review unpreserved constitutional issues for plain error affecting substantial rights. To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights. An error affects substantial rights when it impacts the outcome of the lower court proceedings. Reversal is warranted only when the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings independently of the defendant's innocence. [*Id.* (quotation marks and citations omitted).]

Lymon did not raise a constitutional challenge to registration as a sex offender in the trial court, so this issue is unpreserved.

## B. ANALYSIS

### 1. LEGAL BACKGROUND OF SORA

The history of SORA was summarized as follows by our Supreme Court in *People v Betts*, 507 Mich 527, 533-536; 968 NW2d 497 (2021):

> The Michigan Legislature enacted SORA in 1994 in response to the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 USC 14071, "to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders," MCL 28.721a. This first version of SORA created a confidential database accessible only to law enforcement; it required persons convicted of certain sex offenses to register and notify law enforcement of address changes. MCL 28.725(1), as enacted by 1994 PA 295. Since then, the Legislature has amended the act several times, altering both the nature of the registry and the requirements imposed by it. . . .
>
> The registry became accessible to the public in 1997, when the Legislature required law enforcement to make the registry available for in-person public inspection during business hours. MCL 28.730(2), as amended by 1996 PA 494. Shortly thereafter, in 1999, the Legislature required computerization of the registry and granted law enforcement the authority to make the computerized database available to the public online. MCL 28.728(2), as amended by 1999 PA 85. And in 2006, the Legislature allowed for the registry to send e-mail alerts to any subscribing member of the public when an offender registers within or when a registrant moves into a specified zip code.

As the registry became more accessible to the public, the information registrants were required to provide to law enforcement also expanded. In 2002, the Legislature required registrants to report whenever they enrolled, disenrolled, worked, or volunteered at an institution of higher education. MCL 28.724a, as amended by 2002 PA 542. Two years later, in 2004, the Legislature directed registrants to provide an updated photograph for addition to the online database. MCL 28.728(3)(c), as amended by 2004 PA 238, effective May 1, 2005. And in 2011, the Legislature required registrants to report more personal information, including employment status, "electronic mail addresses and instant message addresses," vehicle information, and travel schedules. MCL 28.727, as amended by 2011 PA 18. Registrants were required to update law enforcement of these changes within three business days, a substantial shortening of the time frame from the initial 10-day reporting window. MCL 28.725(1), as amended by 2011 PA 17. The updates were also required to be made in person rather than by mail, telephone, or e-mail. *Id.* The 2011 amendments further added a periodic reporting requirement that instructed registrants to present themselves to law enforcement, in person, one or more times a year, even if registrants had no changes to report. MCL 28.725a(3), as amended by 2011 PA 17.

In addition to the expansion of personal information contained in the database, the Legislature also increased other restrictions and obligations imposed by SORA. Specifically, amendments effective in 2006 created "exclusion zones" that prohibited most registrants from living, working, or "loitering" within 1,000 feet of a school. MCL 28.733 to MCL 28.736, as amended by 2005 PA 121. The Legislature also added an annual registration fee of $50. See MCL 28.725a(6), as amended by 2013 PA 149.

The Legislature also enacted significant structural amendments of SORA in 2011. These amendments categorized registrants into three tiers on the basis of their offenses and based the length of registration on that tier designation. MCL 28.722(k) and MCL 28.722(s) through (u), as amended by 2011 PA 17. With this reclassification came lengthened registration periods, including a lifetime registration requirement for Tier III offenders. MCL 28.725(12), as amended by 2011 PA 17. Registrants' tier classifications were also made available on the public database. MCL 28.728(2)(l), as amended by 2011 PA 18.

Not all amendments burdened registrants; some were ameliorative. Registration requirements were removed for individuals who were under 14 years old at the time of their offense, MCL 28.722(b), as amended by 2011 PA 17, and for individuals who engaged in consensual but unlawful sexual conduct with a minor under certain conditions, MCL 28.722(t)(*v*), as amended by 2011 PA 17. Students enrolled in remote-learning programs for higher education were relieved from reporting their education status, MCL 28.724a(6), as amended by 2011 PA 17. And Tier I offenders' registration information was removed from public access. MCL 28.728(4)(c), as amended by 2011 PA 18.

SORA initially conceived a confidential law enforcement tool to manage registrants' names and addresses, but by 2012, that tool transformed into a publicly accessible database that imposed significant restrictions on the lives of registrants.

As noted by the *Betts* Court, see *id.* at 533 n 2, SORA was again amended in 2020. See 2020 PA 295, effective March 24, 2021 (the 2021 SORA). The amended statute removed some of the provisions, such as the student-safety zones, see MCL 28.733 to MCL 28.736, as amended by 2005 PA 121, and added an option for the Michigan Police Department to designate a method other than in-person reporting for certain information, see MCL 28.725(1). However, it also "introduced a bevy of other changes." *Betts*, 507 Mich at 567. Some changes in the 2021 SORA were ameliorative, but others were more restrictive. *Id.* at 568. The *Betts* Court noted the following changes:

> allowing for removal from the registry persons who have had their listed offense convictions expunged, see MCL 28.725(16); removing the requirement for a registrant to provide a valid driver's license when that registrant lacks a fixed or temporary residence, see MCL 28.725a(7); adding a requirement that the failure to register be a "willful" failure to comply, MCL 28.729(2); removing a provision preventing the inclusion on the public-registry website of "[a]ny electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and any login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," MCL 28.728(3)(e), as amended by 2013 PA 2; altering when vehicle information must be reported from when "[t]he individual purchases or begins to regularly operate any vehicle, and when ownership or operation of the vehicle is discontinued," MCL 28.725(1)(g), as amended by 2011 PA 17, to the occurrence of "any change in vehicle information," MCL 28.725(2)(a); altering the vehicle information that must be provided from "[t]he license plate number, registration number, and description of any motor vehicle, aircraft, or vessel owned or regularly operated by the individual and the location at which the motor vehicle, aircraft, or vessel is habitually stored or kept," MCL 28.727(1)(j), as amended by 2011 PA 18, to "[t]he license plate number and description of any vehicle owned or operated by the individual," MCL 28.727(1)(j)—notably removing both the "regular" operation requirement and the "motor" vehicle limitation; altering when Internet-related information must be reported from where "[t]he individual establishes any electronic mail or instant message address, or any other designations used in internet communications or postings," MCL 28.725(1)(f), as amended by 2011 PA 17, to "any change in . . . electronic mail addresses[ and] internet identifiers," MCL 28.725(2)(a); and altering the Internet-related information that must be provided from "[a]ll electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," MCL 28.727(1)(i), as amended by 2011 PA 18, to "all electronic mail addresses and internet identifiers registered to or used by the individual," MCL 28.727(1)(i), with "internet identifier" being further defined as

"all designations used for self-identification or routing in internet communications or posting," MCL 28.722(g). [*Betts*, 507 Mich at 568 n 24.]

## 2. LEGAL AND PROCEDURAL BACKGROUND RELEVANT TO THE ISSUE IN THIS CASE

This matter was held in abeyance pending the Supreme Court's decision in *People v Bosca*, 310 Mich App 1; 871 NW2d 307 (2015). Relevant to the issues raised here, the *Bosca* Court held in Part XIII of its decision that it was not cruel and unusual punishment to require a defendant convicted of unlawful imprisonment of a minor to register in accordance with SORA because registration under SORA "does not constitute punishment." *Id*. at 71-72. Thereafter, the Supreme Court entered an order holding *Bosca* in abeyance pending its decision in *People v Temelkowski*, 307 Mich App 241; 859 NW2d 743 (2014). *People v Bosca*, 872 NW2d 492 (2015). In *Temelkowski*, this Court held that requiring a defendant to register under the sex offender registry was not a punishment, so it did not violate the constitutional prohibition on cruel or unusual punishments. *Temelkowski*, 307 Mich App at 270-271. On January 24, 2018, the Supreme Court entered an order reversing this Court's opinion in *Temelkowski* and reinstating the trial court's order removing the defendant from the sex offender registry on the basis that requiring him to register violated due process. *People v Temelkowski*, 501 Mich 960 (2018). The Supreme Court did not address the *Temelkowski* Court's holding that registration under SORA was not a punishment. See *id*.

Thereafter, the Supreme Court entered a second order holding *Bosca* in abeyance pending the decisions in *People v Tucker*, 312 Mich App 645; 879 NW2d 906 (2015) and *People v Snyder*, unpublished per curiam opinion by the Court of Appeals, issued February 18, 2016 (Docket No. 325449). *People v Bosca*, 911 NW2d 465 (2018). In *Tucker*, this Court held that because the student-safety zones and in-person reporting requirements provided for in SORA did not constitute punishment, they necessarily could not constitute cruel or unusual punishment. *Tucker*, 312 Mich App at 683. On September 5, 2018, the Supreme Court vacated its order granting leave to appeal and dismissed the application for leave to appeal. *People v Tucker*, 503 Mich 854 (2018). In *Snyder*, this Court noted that SORA had been construed in *Temelkowski* as a civil remedy, not a punishment, so its application to the defendant did not violate the constitutional prohibition on ex post facto laws. *Snyder*, unpub op at 3. On October 8, 2021, the Supreme Court entered an order reversing that part of this Court's *Snyder* opinion and vacated the defendant's conviction of failing to comply with SORA. *People v Snyder*, 964 NW2d 594 (2021).

After dismissing *Tucker* and entering a decision in *Snyder*, the Supreme Court entered an order in *Bosca*, reversing Part XIII of the *Bosca* Court's opinion, including its conclusion that it was not cruel and unusual punishment to require a defendant convicted of unlawful imprisonment of a minor to register under SORA. *People v Bosca*, 969 NW2d 55 (2022). The Supreme Court then remanded the matter to the trial court for further proceedings consistent with its recent decision in *Betts*.

At issue in *Betts* was whether the retroactive application of the 2011 SORA violated the federal and state prohibitions on ex post facto laws; the Court held that it did. *Betts*, 507 Mich at 562. Relevant here, although *Betts* did not address whether registration under SORA was a cruel or unusual punishment under our state constitution, it did conclude that "the 2011 SORA's

aggregate punitive effect negates the state's intention to deem it a civil remedy." *Id*. In doing so, the Supreme Court did not address whether the 2021 SORA imposed a punishment or was a civil remedy. *Id*. at 533 n 2, 566 n 24.

Because the constitutional prohibition against cruel or unusual punishment requires that there first be a punishment imposed, the first step in our analysis is to determine whether our Legislature intended the 2021 SORA "as a criminal punishment or a civil remedy," and, if it was intended as a civil remedy, "whether the statutory scheme was so punitive either in purpose or effect as to negate the State's intention to deem it civil." *People v Earl*, 495 Mich 33, 38; 845 NW2d 721 (2014).

### 3. IS REGISTRATION UNDER THE 2021 SORA A PUNISHMENT?

The first inquiry looks at whether the Legislature intended the 2021 SORA as a criminal punishment or a civil remedy. See *id*. That question was answered by our Supreme Court in *Betts*. The *Betts* Court held that the statement of intent set forth in MCL 28.721a[4] "indicates that the Legislature's intent in enacting SORA was the promotion of public safety, a nonpunitive goal." *Betts*, 507 Mich at 548. A nonpunitive goal is also indicated based on the fact that SORA "was codified in Chapter 28 of the Michigan Complied Laws, not Chapter 750, the Michigan Penal Code." *Id*. The *Betts* Court recognized that "other aspects of SORA suggest a punitive intent:" (1) SORA seeks to promote public safety by deterring future crimes; (2) an individual must register for SORA "as a consequence of a criminal conviction;" (3) SORA's requirements are enforced by law enforcement; and (4) violations of SORA's requirements are punishable by a criminal conviction. *Id*. "Weighing these characteristics against the Legislature's expression of its intent in MCL 28.721a," the Supreme Court concluded "that the Legislature likely intended SORA as civil regulation rather than a criminal punishment." *Id*. at 548-549.

The Supreme Court's holding was not dependent upon any language specific to the 2011 SORA, but even if it were, the 2021 SORA did not include an amendment of the statement of legislative intent in MCL 28.721a, did not recodify SORA as part of the Michigan Penal Code, and did not alter any of the parts identified by the Supreme Court as indicative of a punitive intent.

---

[4] MCL 28.721a provides:

> The legislature declares that the sex offenders registration act was enacted pursuant to the legislature's exercise of the police power of the state with the intent to better assist law enforcement officers and the people of this state in preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders. The legislature has determined that a person who has been convicted of committing an offense covered by this act poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state. The registration requirements of this act are intended to provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons who pose such a potential danger.

Given that the legal basis for the Supreme Court's decision remains unchanged, its holding that the Legislature likely intended the 2011 SORA as a civil regulation, not a criminal punishment, is also applicable to the 2021 SORA.

The second inquiry looks at "whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Earl*, 495 Mich at 38. Again, our inquiry is guided by our Supreme Court's analysis in *Betts*. In *Betts*, the Court applied the factors set forth by the United States Supreme Court in *Kennedy v Mendoza-Martinez*, 372 US 144; 83 S Ct 554; 9 L Ed 2d 644 (1963) (the *Mendoza-Martinez* factors). The Court stressed that the challenging party had to "provide the clearest proof of the statutory scheme's punitive character in order to successfully negate the State's intention to deem it civil." *Betts*, 507 Mich at 549 (quotation marks, citation, and alteration omitted). The reviewing court does not "examine individual provisions of SORA in isolation but instead [must] assess SORA's punitive effect in light of all the act's provisions when viewed as a whole." *Id*.

The first *Mendoza-Martinez* factor requires a determination as to "whether SORA has been regarded in our history and traditions as a form of criminal punishment." *Id*. at 550. In *Betts*, our Supreme Court held that "the 2011 SORA does resemble, in some respects, the traditional punishments of banishment, shaming, and parole." *Id*. The conclusion that the 2011 SORA resembled the traditional punishment of banishment was based on the 2011 SORA's student-safety zones. Because that section was removed by the 2021 SORA, we conclude that the 2021 SORA does not resemble the traditional punishment of banishment. However, like the 2011 SORA, the 2021 SORA continues to resemble the traditional punishments of shaming and parole.

With respect to the traditional punishment of shaming, the *Betts* Court held:

> The 2011 SORA also resembles the punishment of shaming. The breadth of information available to the public—far beyond a registrant's criminal history—as well as the option for subscription-based notification of the movement of registrants into a particular zip code, increased the likelihood of social ostracism based on registration. While the initial version of SORA might have been "more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality," *Smith* [*v Doe*], 538 US [84,] 99[; 123 S Ct 1140; 155 L Ed 2d 164 (2003)], its 2011 iteration contained more personal information and required less effort to access that information. The public-facing registry contained not only information regarding a registrant's criminal conviction but also the registrant's home address, place of employment, sex, race, age, height, weight, hair and eye color, discernible features, and tier classification. When SORA's notification provision was used, members of the public were alerted to this information without active effort on their behalf, in sharp contrast with the endeavor of visiting an official archive for information. Further, a registrant's information could precede his entrance into a community, increasing the likelihood of ostracism. MCL 28.721a itself—the Legislature's statement of its intent in enacting SORA—refers to providing the public, not just law enforcement, with the means to monitor persons with sex-offense convictions, encouraging public participation and engagement with the registry and furthering the stigma of registration. See *Doe* [*v State*], 167 NH [382,] 406[; 111 A3d 1077

(2015)] ("Placing offenders' pictures and information online serves to notify the community, but also holds them out for others to shame or shun."). As with banishment, however, the 2011 SORA does not perfectly resemble the traditional punishment of shaming. See *Smith*, 538 US at 97-98 (describing traditional shaming punishments such as requiring offenders to stand in public with signs describing their crimes or branding offenders in order to inflict permanent stigma). The 2011 SORA did not provide a conduit for the public to directly criticize and shame registrants—as it would have, for example, if it provided an online forum or area for comments in addition to the online registry. [*Id*. at 551-552.]

Although the 2021 SORA prevents the registrant's tier classification from being available on the public website, MCL 28.728(3)(e), it also removed the provision of the prior version of SORA that prevented the public website from making available "[a]ny electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and any login names or other identifiers used by the individual when using any electronic mail address or instant messaging system." Compare MCL 28.728(3)(e), as amended by 2013 PA 2 with MCL 28.728(3), as amended by 2020 PA 295. Moreover, whereas the prior version of SORA required the registrant to report "[a]ll electronic mail addresses and instant message addresses assigned to the individual or routinely used by the individual and all login names or other identifiers used by the individual when using any electronic mail address or instant messaging system," MCL 28.727(1)(i), as amended by 2011 PA 18, under the 2021 SORA, a registrant is required to report "all electronic mail addresses and internet identifiers registered to or used by the individual. MCL 28.727(1)(*i*). An internet identifier is defined as "all designations used for self-identification or routing in internet communications or posting." MCL 28.722(g).

Therefore, under the 2021 SORA, the scope of Internet-based information that a registrant must report is not only broader, but it is also permissible to make such information available on the public website. Consequentially, although the 2021 SORA made an ameliorative change to the information that was available on the public website, it also removed a section of the statute preventing the public website from making available the registrant's Internet-based identifying information. Because a registrant's Internet-based identifiers are no longer prevented from being included on the public website, the registrant is subjected to both ostracization in his or her community as well as while he or she interreacts with individuals using Internet-based communications and interactions. As a result, we conclude that the 2021 SORA continues to resemble the traditional punishment of shaming.

With respect to the traditional punishment of parole, the Supreme Court held in *Betts* that:

the 2011 SORA also resembles parole. Although registrants need not have sought permission to make life changes, they were not free to live and work where they desired because of the student-safety zones. Registrants, like parolees, were required to periodically report in person to law enforcement. See MCL 28.725a(3), as amended by 2011 PA 17; MCL 28.725(1), as amended by 2011 PA 17. They were also required to pay registration fees. See MCL 28.725a(6), as amended by 2011 PA 17. Failure to comply with SORA's requirements, like the failure to comply with parole conditions, potentially subjects the offender to imprisonment. See MCL 28.729(1), as amended by 2011 PA 18. Further, as with parole, a law

enforcement officer at any time could have investigated a registrant's status based on an anonymous tip. The 2011 SORA thus imposed a significant amount of supervision by the state on registrants. This amount of supervision differentiates the 2011 SORA from the 2003 Alaska sex-offender registry, which the United States Supreme Court held did not resemble parole because registrants were "free to move where they wish and to live and work as other citizens" and because registrants were not required to make periodic updates to law enforcement in person. *Smith*, 538 US at 101-102. Neither of these characteristics is true of the 2011 SORA.

Likewise, under the 2021 SORA, a registrant is still required to periodically report to law enforcement. See MCL 28.725a(3).[5] The requirement that they pay registration fees—both upon initial registration and annually for years thereafter—is also still in effect. MCL 28.725a(6). Further, like the failure to comply with parole conditions, the failure to comply with the requirements of the 2021 SORA continues to subject the offender to imprisonment. See MCL 28.729. Finally, nothing in the 2021 SORA has altered that ability of a law enforcement officer to investigate, at any time, "a registrant's status based on an anonymous tip." See *Betts*, 507 Mich at 553.

In conclusion, as it relates to the first *Mendoza-Martinez* factor, although the 2021 SORA does not bear any resemblance to the traditional punishment of banishment, it continues to bear a significant resemblance to the traditional punishments of shaming and parole because of its "publication of information and encouragement of social ostracism" and its "imposition of significant state supervision." See *id*.

The next *Mendoza-Martinez* factor looks at "how the effects" of the 2021 SORA "are felt by those [whom are] subject to it." *Id*. at 554. "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Id*., quoting *Smith*, 538 US at 100. In its analysis of this factor in relation to the 2011 SORA, our Supreme Court concluded that "the 2011 SORA imposed onerous restrictions on registrants by restricting their residency and employment, and it also imposed significant affirmative obligations by requiring extensive in-person reporting." *Betts*, 507 Mich at 556.

We begin our analysis by noting that the 2021 SORA has lessened the restrictions placed on registrants by removing the student-safety zone requirement. MCL 28.733 to MCL 28.736, as amended by 2005 PA 121. Moreover, under the 2021 SORA, it is possible that the registrant will no longer have to make the reports required by MCL 28.725(1) in person; the Michigan State Police instead now have the discretion to, but are not required to, prescribe another manner for

---

[5] The reporting requirement in MCL 28.725(1) has been amended by the 2021 SORA. Now, rather than in-person reporting being the only option, the statute provides that the registrant "shall report in person, or in another manner as prescribed by" the Michigan State Police. Although the Michigan State Police have the discretion to prescribe another reporting manner, they have no obligation to do so. Moreover, even if an alternate reporting manner is, in fact, prescribed by the Michigan State Police, other parts of the 2021 SORA still require in-person reporting.

-14-

reporting. See MCL 28.725(1). Nevertheless, the reporting obligations still impose an onerous restriction on registrants. Under the 2021 SORA, a registrant has only three days to report numerous life events, including moving residences or domiciles; changing employment; changing educational status; changing names; making plans to reside outside of the home for more than 7 days; changing vehicles or any vehicle information; changing electronic mail addresses, internet identifiers, or telephone numbers. See MCL 28.725. Further, although the immediate in-person reporting of changes in Internet-based information has been lengthened to not more than three business days, MCL 28.725a, the burden is still significant in light of our Supreme Court's observation that "[g]iven the ubiquity of the Internet in daily life, this requirement might have been triggered dozens of times within a year." *Betts*, 507 Mich at 555. Moreover, the 2021 SORA did not alter the requirement that a registrant make periodic in-person reports to law enforcement—without regard to whether any information has changed. See MCL 28.725a(3). As recognized by the *Betts* Court, "these frequent in-person reports imposed a burden on registrants, especially for those who might have had difficulty traveling to make the reports—such as those who did not have access to public transportation, did not have the financial resources necessary for private or public transportation, or had health or accessibility issues that would have impeded transportation." *Betts*, 507 Mich at 556. Finally, like the 2011 SORA, the 2021 SORA ensures "adherence to its many requirements on the potential for imposition of imprisonment." See *id*. at 554. See also *Smith*, 538 US at 100 (noting that imprisonment is the paradigmatic affirmative restraint).

In sum, notwithstanding the removal of the student-safety zone restrictions, and the loosening of the in-person reporting requirements, we conclude that the 2021 SORA imposes significant affirmative obligations on registrants by mandating upon pain of imprisonment that they report common life changes within a short period of time, sometimes in person and sometimes in a manner not specified in statute.

The third *Mendoza-Martinez* factor requires this Court to consider whether the 2021 SORA "promotes the traditional aims of punishment: retribution and specific and general deterrence." *Betts*, 507 Mich at 556. In *Betts*, the Supreme Court held that "SORA promotes the aim of deterrence." *Id*. The Court reasoned:

> Deterrence is necessarily encompassed by SORA's stated purpose of "preventing and protecting against the commission of future criminal sexual acts by convicted sex offenders." MCL 28.721a. The extensive requirements of the 2011 SORA also generally deterred potential offenders by increasing the resultant consequences of sexual predation. Yet the aim of deterrence alone does not render a statute punitive. See *Smith*, 538 US at 102. As the United States Supreme Court has reasoned, "To hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' . . . would severely undermine the Government's ability to engage in effective regulation." *Id*. (quotation marks and citation omitted). However, the deterrent effect of the 2011 SORA is not merely an indirect consequence, incidental to its regulatory function, but instead a main feature of the statutory scheme. See MCL 28.721a. [*Id*. at 556-557.]

We find that, like the 2011 SORA, the deterrent effect of the 2021 SORA is also not merely an indirect consequence that is incidental to its regulatory function, but is instead a main feature of the statutory scheme. Again, no change to MCL 28.721a has been made in the 2021 SORA that would compel a different result.

The Supreme Court additionally held that the 2011 SORA supported the aim of retribution because:

> [t]he 2011 SORA was imposed on offenders for the sole fact of their prior offenses and made no individualized determination of the dangerousness of each registrant, indicating that SORA's restrictions were retribution for past offenses rather than regulations to prevent future offenses. See *Smith*, 538 US at 109 (Souter, J., concurring in the judgment) ("The fact that the Act uses past crimes as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones."). [*Betts*, 507 Mich at 557.]

We find that these same principles are applicable to the 2021 SORA and, as a result, like the 2011 SORA, the 2021 SORA also supports the aim of retribution.

In conclusion, because the 2021 SORA aimed to protect the public through deterrence and because its restrictions support the aim of retribution, we conclude that the 2021 SORA promotes the traditional aims of punishment.

The fourth *Mendoza-Martinez* factor requires consideration of whether the 2021 SORA has a rational connection to a nonpunitive purpose. *Betts*, 507 Mich at 558. We conclude that it does. As explained in *Betts*,

> the asserted goal of the Legislature is to "provide law enforcement and the people of this state with an appropriate, comprehensive, and effective means to monitor those persons" who have committed a specified sex offense and who are therefore considered to "pose[ ] a potential serious menace and danger to the health, safety, morals, and welfare of the people . . . of this state." MCL 28.721a. The protection of citizens from potentially dangerous sex offenders is "a compelling state interest in furtherance of the state's police powers." [*State v*] *Letalien*, [2009 ME 130;] 985 A2d [4] 22 [(2009)]. [*Id.* at 558.]

Like the 2011 SORA, the 2021 SORA, furthers the nonpunitive purpose of public safety "by identifying potentially recidivist sex offenders and alerting the public." See *id.*

The final *Mendoza-Martinez* factor is "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 559 (quotation marks and citation omitted). The touchstone of this inquiry "is 'reasonableness,' not whether the legislature has made the best choice

-16-

possible to address the problem it seeks to remedy." *Id*. (quotation marks and citation omitted). In *Betts*, this Court considered this factor in relation to the 2011 SORA, reasoning:

> The Legislature's asserted nonpunitive goal was based on the Legislature's determination that "a person who has been convicted of committing an offense covered by [SORA] poses a potential serious menace and danger to the health, safety, morals, and welfare of the people, and particularly the children, of this state." MCL 28.721a. Central to our inquiry, then, is whether the 2011 SORA is a reasonable means of protecting the public from sex offenders who allegedly pose such a "potential serious menace." *Id*. [*Id*.]

Here, given that there has been no change to the Legislature's asserted nonpunitive goal, the same inquiry must be made as it relates to the 2021 SORA. Moreover, as noted by our Supreme Court in *Betts*, a number of studies support the proposition that "the dangerousness of sex offenders has been historically overblown," "that, in fact, sex offenders are actually less likely to recidivate than other offenders," and that "sex-offender registries have dubious efficacy in achieving their professed goals of decreasing recidivism." *Id*. at 560.[6] Rather than determine if the studies were compelling, the *Betts* Court noted that, "at a minimum, the studies cited demonstrate that the 2011 SORA efficacy is unclear." *Id*. at 561. Likewise, the same articles support an inference that the 2021 SORA's efficacy at decreasing the recidivism of sex offenders is also unclear.

---

[6] The Supreme Court referenced the following:

> United States Department of Justice, Alper & Durose, Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-2014) (May 2019), available at <https://www.bjs.gov/content/pub/pdf/rsorsp9yfu0514.pdf> (accessed June 4, 2021) [https://perma.cc/U9HY-MJ7F] (concluding that sex offenders are less likely than other offenders to be rearrested for any crime); Huebner et al., An Evaluation of Sex Offender Residency Restrictions in Michigan and Missouri (July 1, 2013), p. 72, available at <https://www.ncjrs.gov/pdffiles1/nij/grants/242952.pdf> (accessed June 4, 2021) [https://perma.cc/D9K4-CV5P] (concluding that residency restrictions "are unlikely to mitigate or reduce the risk of recidivism among sex offenders"); Prescott & Rockoff, *561 Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?, 54 J. L. & Econ. 161, 192 (2011) (concluding that notification requirements in a typical sex-offender registry "effectively increases the number of sex offenses by more than 1.57 percent," likely "because of the social and financial costs associated with the public release of their criminal history and personal information"). [*Betts*, 507 Mich at 560-561.]

-17-

In light of the uncertainty of the 2021 SORA's efficacy at decreasing recidivism, we conclude that the restraints it imposed were excessive, even though there were fewer restraints in the 2021 SORA than the 2011 SORA.[7] As observed by our Supreme Court:

> Over 40,000 registrants were subject to the 2011 SORA's requirements without any individualized assessment of their risk of recidivism. The duration of an offender's reporting requirement was based solely on the offender's conviction and not the danger he individually posed to the community. Registrants remained subject to SORA—including the stigma of having been branded a potentially violent menace by the state—long after they had completed their sentence, probation, and any required treatment. . . . Registrants were also required to make frequent in-person reports to law enforcement upon minor life changes and regular in-person reports— sometimes multiple times a year—even when no information had changed. These demanding and intrusive requirements, imposed uniformly on all registrants regardless of an individual's risk of recidivism, were excessive in comparison to SORA's asserted public-safety purpose.

In conclusion, having considered the *Mendoza-Martinez* factors cumulatively, we conclude that the 2021 SORA's aggregate punitive effect negates the Legislature's intention to deem it a civil regulation. As a result, requiring an individual to comply with the 2021 SORA imposes a criminal punishment on a registrant. That does not, however, end our inquiry. In order to be entitled to relief in this case, Lymon must demonstrate that the punishment of being required to comply with the 2021 SORA is cruel and/or unusual punishment.

## 4. CRUEL OR UNUSUAL PUNISHMENT

"The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16, whereas the United States Constitution prohibits cruel *and* unusual punishment, US Const., Am VIII." *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011) (emphasis added). "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id.* (quotation marks and citation omitted). To determine whether a punishment is cruel or unusual, courts assess whether it is "unjustifiably disproportionate" to the offense committed by considering four factors: (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. *People v Bullock*, 440 Mich 15, 30, 33-34; 485 NW2d 866 (1992).

We note at the outset that we do not address whether registration under SORA is cruel or unusual punishment per se, but rather whether it is cruel or unusual punishment for a crime that lacks a sexual component and is not sexual in nature. Here, Lymon was convicted of two counts of unlawful imprisonment of a minor. Although his actions in committing the offenses are

---

[7] As has been noted repeatedly in this opinion, the most significant change between the 2011 SORA and the 2021 SORA was the removal of the student-safety zones.

extremely disturbing, there simply are no facts in this case supporting an inference that there was any sexual component to the offenses he committed. Instead, the record reflects that he unlawfully imprisoned his minor children, not during a sexual assault, but rather while he terrorized and threatened them with a gun. As punishment for this heinous, but non-sexual offense, he was sentenced to 84 to 180 months' imprisonment. He was also required to register under SORA. The nature of his underlying offense means that he had to register as a Tier I offender. See MCL 28.722(q) and (r)(*iii*). As noted above, registration under SORA imposes affirmative obligations amounting to an onerous burden on registrants. As a Tier I offender, Lymon must comply with the requirements imposed by SORA for 15 years. MCL 28.725(10).[8] The 15-year registration period, however, excludes "any period of incarceration for committing a crime." MCL 28.725(14). As a result, in addition to the 7 to 15 year sentence of incarceration that he must serve for the offense of unlawful imprisonment, he will have another 15 years of punishment in the form of state supervision and public shaming imposed by his registration under the 2021 SORA.[9]

For the duration of that 15-year period, Lymon must report in person or in a method prescribed by the Michigan State Police if any of the following normal life changes occur: change in residence or domicile; change in employment; enrollment or discontinuance of enrollment with an institute of higher education; change of name; change of vehicle information; change of e-mail address, internet identifiers, or telephone number. MCL 28.725(1)-(2). If Lymon intends to temporarily reside outside his place of residence for more than 7 days, he must report that fact as well. MCL 28.725(2)(b). Before he can move to another state, he must first report that change in person; likewise, if he desires to travel to another country for more than 7 days, he must make an in person report. MCL 28.725(8). In addition, even if there has been no change to his residence or domicile, once per year in the month of his birth, Lymon must report in person to verify his domicile, as well as any information that he reported under MCL 28.724a. MCL 28.725a(3)(a). While making his annual in-person report, Lymon will be evaluated to determine whether his photograph matches his appearance "sufficiently to properly identify him" from the photograph. MCL 28.725a(3)(a). If it does not, then he must obtain a current photograph within 7 days. MCL 28.725a(3)(a). Unless he can establish indigency, see MCL 28.725b(3), Lymon must pay a $50 annual registration fee. MCL 28.725a(6). Unless he is homeless, he must maintain either a valid operator's or chauffeur's license or an official state personal identification card with his current address. MCL 28.725a(7). He may, at the discretion of an officer or authorized employee, be required to produce other documents bearing his name, such as a voter registration or a bill. MCL 28.725a(7). These affirmative obligations place an onerous burden on Lymon for a period equal to the maximum sentence that he can be required to serve on the underlying conviction.

Moreover, for a 15-year period, the following information regarding Lymon must be made available on a public website: his name (legal, aliases, nicknames, ethnic or tribal names, and any other name); his date of birth; his address; the address of each of his employers and the address of

---

[8] There is a procedure to remove a registrant's name from the registry. See MCL 28.728c. However, it essentially requires that Lymon maintain a "clean" record for a decade. See MCL 28.728c(12).

[9] An offender who serves his or her maximum sentence is not subject to additional state supervision in the form of probation or parole upon his release.

the places where he is working; the address of any school that has accepted him as a student and that he plans to attend; his license plate number and a description of any vehicle he owns or operates; a summary of his convictions for listed offenses; a complete physical description; a photograph; and his registration status. MCL 28.728(2). As noted earlier in the opinion, there is no statutory prohibition against additional information, such as his Internet identifiers, from also being made available on the public website. Given the social stigma that results from an individual being placed on a sexual offender registry, we conclude Lymon's placement on the public registry is also a severe punishment because he has not been convicted of an offense that includes a sexual component.[10] Simple logic compels the conclusion that an individual on the *sexual* offender registry has committed an offense with a *sexual* component, i.e., that he is a sexual offender.[11] Here, because there is no sexual component to Lymon's offense, any negative consequences that he must face as a result of being publicly listed on a website purporting to identify sexual offenders, arises from his placement on the registry, not from his underlying conviction.

Finally, Lymon's failure to comply with the requirements under SORA can result in him being convicted of felonies or misdemeanors, and being subjected to fines and/or imprisonment. See MCL 28.729. Although his failure to comply must be willful, see *id.*, we conclude that this nevertheless is another aspect of his punishment that must be weighed against the gravity of his underlying offense.

In light of the foregoing, and weighing the gravity of the offense against the severity of the penalty imposed, we conclude that registration under SORA results in punishment grossly disproportionate to the offense. For a period of time equal to the maximum length of his incarceration for the underlying offense, Lymon must meet the onerous reporting requirements, he must suffer the social stigma of being placed on a sex offenders registry despite having not committed an offense with a sexual component, and he is subject to additional convictions and incarceration should he fail to comply.

The next factor looks to the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan. *Bullock*, 440 Mich at 33. It is axiomatic that the majority of offenses that do not have a sexual component do not result in the offender being placed on the sexual offender registry. In this case, however, we do not have to look far to see the injustice inherent in imposing an additional punishment on Lymon for his conviction of unlawful imprisonment of his children. He was convicted of three counts of unlawful imprisonment. Each count was based on the same underlying facts: Lymon, using a gun, restrained Jacqueline and his children, making them sit on the sofa, kneel in front of the fireplace, and stay in the family room for the entirety of the night while he threatened to kill them. Despite being based on identical criminal conduct, the penalty for the two counts involving his children is substantially more severe.

---

[10] We note that although all felony convictions carry with them a certain stigma, convictions for crimes sexual in nature produce a taint that surpasses almost all other crimes.

[11] We also note that registering individuals convicted of crimes lacking in any sexual aspect would not only expose those individuals to a disproportionate level of stigma and punishment, but would also seem to dilute and undermine the efficacy of registration for its intended purposes.

We conclude, therefore, that this factor also weighs in favor of a finding that, as applied to Lymon, registration under SORA is cruel or unusual punishment.

The third factor recognizes that it "may be useful to compare the sentences imposed for commission of the same crime in other jurisdictions." *Id*. at 34 (quotation marks and citation omitted). We do not find this factor particularly compelling under the facts of this case. Other states, like Michigan, require registration under their versions of SORA for kidnapping or imprisonment of a minor. Those states include, but are not limited to, New York,[12] Arkansas,[13] Wisconsin,[14] and Kentucky.[15] Yet, we have concluded that registration under Michigan's 2021 SORA is a punishment in the constitutional sense. In contrast, the courts in New York,[16] Arkansas,[17] Wisconsin,[18] have held that their versions of SORA are not punitive, whereas other states have held that their versions of SORA do, in fact constitute punishments.[19] We conclude that given that each state's version of SORA appears to include both minor and major differences when compared to our version of SORA, a comparison to the penalty imposed in other states does little to shed light on whether the penalty imposed on Lymon in this case is cruel or unusual punishment.

The final factor requires consideration of whether the penalty imposed advances the goal of rehabilitation. *Bullock*, 440 Mich at 34. We conclude that it does not. We find persuasive this Court's analysis on the rehabilitation that was stated in *People v Dipiazza*, 286 Mich App 137, 156; 778 NW2d 264 (2009). In that case, this Court held:

> [I]t is abundantly clear that there is no goal of rehabilitation in this case. Defendant never posed a danger to the public or a danger of reoffending. Defendant is not a sexual predator, nor did the trial court deem him to be. Further, even if defendant needed rehabilitation, SORA's labeling him as a convicted sex offender works at an opposite purpose, preventing defendant from securing employment and otherwise moving forward with his life plans.

Likewise, in this case, there is nothing to suggest that the danger Lymon poses to the public is related to a sexual offense, nor is there anything to suggest that he will commit a sexual offense in

---

[12] *People v Knox*, 12 NY3d 60, 67-68; 903 NE2d (2009).

[13] Ark Code Ann § 12-12-903(13-A)(r).

[14] *State v Smith*, 323 Wis 2d 377, 401-403; 2010 WI 16; 780 NW2d 90 (2010).

[15] *Moffitt v Commonwealth*, 360 SW3d 247 (Ky App, 2012).

[16] *People v Parilla*, 109 App Div 3d 20, 29; 970 NYS2d (2013).

[17] *Parkman v Sex Offender Screening and Risk Assessment Committee*, 2009 Ark 205, 16; 307 SW3d 6 (2009).

[18] *In the Interest of CG*, 396 Wis 2d 105, 132; 2021 WI App 11; 955 NW2d 443 (2021).

[19] See *Does #1-5 v Snyder*, 834 F3d 696, 705 (CA 6, 2016) (collecting cases).

the future.  He is not a sexual predator.  And, to the extent that he needs rehabilitation, labeling him as a sex offender, does not serve any rehabilitation goals related to his actual offense.[20]

Consequently, having considered the gravity of the offense, the harshness of the penalty, and the goal of rehabilitation, we conclude that requiring Lymon to register as a sex offender for 15 years is cruel or unusual punishment because it is unjustifiably disproportionate to the offense committed.  On remand the trial court shall enter an order removing Lymon from the sex offender registry.[21]

Affirmed but remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Kirsten Frank Kelly
/s/ Amy Ronayne Krause

---

[20] We note that there is conflicting information regarding the recidivism rate for sex offenders. Compare *McKune v Lile*, 536 US 24, 32-34; 122 S Ct 2017; 153 L Ed 2d 47 (2002) (concluding that, based on United States Department of Justice data, sex offenders face a "frightening and high risk of recidivism") with *Betts*, 507 Mich at 559 (recognizing that there is "[a] growing body of research" that supports the propositions that the "dangerousness of sex offenders has been historically overblown" and that, "in fact, sex offenders are less likely to recidivate than other offenders.").  Here, because Lymon is not a sex offender, the research on the recidivism rate for sexual offenders is not relevant to a determination as to whether he is likely to recidivate.

[21] Because Michigan's Constitution provides broader protection than its federal counterpart, *Bullock*, 440 Mich at 30, we need not address whether there was also a violation of the Eighth Amendment to the United States Constitution.